J-S45007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WINSTON JOHNSON KING, | |
| Appellant | No. 777 EDA 2019 |

Appeal from the Judgment of Sentence Entered January 8, 2019
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0000448-2018

BEFORE:  BENDER, P.J.E., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED NOVEMBER 05, 2019**

Appellant, Winston Johnson King, appeals from the judgment of sentence of an aggregate term of 5 to 10 years' imprisonment, imposed after he was convicted by a jury of possession with intent to deliver (PWID) a controlled substance, 35 P.S. § 780-113(a)(30), possession of a controlled substance, 35 P.S. § 780-113(a)(16), possession of drug paraphernalia, 35 P.S. § 780-113(a)(32), and criminal conspiracy to commit PWID, 18 Pa.C.S. § 903.  Herein, Appellant challenges the sufficiency and weight of the evidence to sustain his convictions.  After careful review, we agree with Appellant that the evidence was insufficient.  Therefore, we reverse his judgment of sentence and order his immediate discharge.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellant was arrested and charged with the above-stated offenses after a vehicle driven by his co-defendant, Tynika Lataya Moses, in which Appellant was a passenger, was stopped by Pennsylvania State Trooper John Stepanski. After Moses consented to a search of the vehicle, Trooper Stepanski discovered a large quantity of heroin hidden in a compartment in the trunk of the car. Appellant's and Moses' cases were joined and they proceeded to a jury trial on October 29, 2018. On October 30, 2018, following the Commonwealth's case-in-chief, Appellant moved for judgment of acquittal on all charges. The court denied that motion. At the close of trial on October 31, 2018, the jury convicted Appellant of PWID, possession of a controlled substance, possession of drug paraphernalia, and conspiracy to commit PWID.[1] On January 8, 2019, Appellant was sentenced to the aggregate term set forth *supra*.

Appellant filed a timely post-sentence motion that was denied by the court on February 14, 2019. He then filed a timely notice of appeal, and he also complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant states three issues for our review:

> 1. Did the trial court err when it denied [Appellant's] motion for judgment of acquittal on all counts at the close of the Commonwealth's case where the Commonwealth failed to present evidence of a criminal agreement between [Appellant] and Tynika

---

[1] Moses was also convicted of these same offenses. She filed an appeal that was docketed by this Court at 453 EDA 2019.

Moses or that [Appellant] had any knowledge of the contraband in the trunk of Moses' car?

2. Was the evidence presented at trial legally sufficient to justify the jury's verdict of guilty on all counts where the Commonwealth failed to present evidence of a criminal agreement between [Appellant] and Tynika Moses or that [Appellant] had any knowledge of the contraband in the trunk of Moses' car?

3. Did the trial court err in denying [Appellant's] request for a new trial on the grounds that the verdict was against the weight of the evidence where the only evidence tending to show [Appellant's] guilt was highly speculative and the scientific evidence presented tended to show that another individual placed the drugs into the car's trunk?

Appellant's Brief at 4.

Appellant's first two issues challenge the sufficiency of the evidence to sustain his convictions. *See Commonwealth v. Emanuel*, 86 A.3d 892, 894 (Pa. Super. 2014) ("A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.") (citation omitted).

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno,* 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell,* 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. *Moreno, supra* at 136.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011).

- 3 -

In this case, Appellant challenges his convictions for PWID, possession of a controlled substance, possession of drug paraphernalia, and conspiracy to commit PWID. Because our standard of review requires us to assess the evidence in the light most favorable to the Commonwealth, as the verdict winner, we reproduce the Commonwealth's summary of the evidence admitted at Appellant's trial:

Pennsylvania State Police Trooper John Stepanski was assigned to monitor westbound traffic on Interstate 78 on October 3, 2017. Trooper Stepanski had over nine years' experience as a police officer at the time, as well as over two hundred and fifty hours of narcotics and interdiction training. N.T., 10/29/18, at 54-56, 72. During his time with the State Police, Trooper Stepanski conducted thousands of traffic stops and effected more than two hundred and fifty drug-related arrests, the majority of which occurred following a traffic stop. *Id.* at 55.

On October 3, 2017, just after 2:00 p.m., Trooper Stepanski observed a black Dodge Charger with darkly tinted windows. *Id.* at 57. He initiated a traffic stop. *Id.* at 58. Trooper Stepanski approached the front passenger side of the vehicle, where Appellant was seated. *Id.* at 59-60. Appellant's co-defendant, Ms. Moses, was seated in the driver's seat. *Id.* at 60. When Trooper Stepanski approached, Appellant was on his cell phone, which Trooper Stepanski testified was unusual in his experience during traffic stops, and was avoiding eye contact. *Id.* at 82-83, 169. Trooper Stepanski obtained identification from both individuals. *Id.* at 61. Appellant had a New Jersey identification card; Ms. Moses had a New Jersey driver's license. *Id.* at 61. Trooper Stepanski learned that the car, which had New Jersey license plates, was recently registered to Ms. Moses at a Newark, New Jersey address. *Id.* at 58-59, 63. Trooper Stepanski testified that Ms. Moses was nervous during his initial interaction with her and became more nervous when she was asked to exit the vehicle. *Id.* at 99, 104-05. Trooper Stepanski described that at one point, Ms. Moses was fidgeting and struggling to open a cough drop and eventually put the entire cough drop, still in the wrapper, in her

mouth. *Id.* at 82. Trooper Stepanski observed Appellant to have "[v]ery abnormal behavior, very nervous."[2] *Id.* at 81.

During the course of the stop, Ms. Moses consented to a search of the vehicle. *Id.* at 64-65, 110; Commonwealth's Exhibit 1. Trooper Stepanski found four cell phones in the front center console, three of which belonged to Appellant. N.T., 10/29/18, at 67, 182. During the search of the trunk of the vehicle, Trooper Stepanski discovered three sets of New Jersey license plates. *Id.* at 69. Testifying as an expert in drug interdiction, Trooper Stepanski explained that "smugglers typically change their license plates out quite frequently." *Id.* at 76. He further stated that drug couriers "keep a fresh license plate so it is not being tracked in high trafficking areas." *Id.* at 77.

Trooper Stepanski continued his search in the trunk of the vehicle. At that time, Appellant "became extremely nervous and agitated. He bladed his body away from" police. *Id.* at 83-84, 112. Trooper Stepanski testified that Appellant's demeanor and body language led him to believe contraband would be found in the trunk. N.T., 10/30/18, at 183. During his search, Trooper Stepanski observed tool marks on the wing nuts that attach the carpet to the side[-]wall of the trunk. N.T., 10/29/18, at 78. He explained that these marks were indicative of someone removing the wing nuts to access the large empty space between the sheet metal and the carpet. *Id.* Trooper Stepanski stated that there is "no legitimate purpose of removing these wing nuts and removing the carpet [except] to discover these natural voids." N.T., 10/30/18, at 179.

After observing these markings, Trooper Stepanski removed the wing nuts to check the space behind the carpet. When he performed his search on the right said of the vehicle, he observed Appellant "blade[] himself away from the traffic stop, away from the other officers" and "bec[o]me very engaged in what [Trooper Stepanski] was doing." N.T., 10/29/18, at 83-84, 112. Trooper Stepanski described Appellant as staring intently at him and the

---

[2] We note that, just after this statement by Trooper Stepanski, the court asked him to clarify which defendant he was referring to, and the trooper proceeded to focus his testimony on Moses' nervous conduct. N.T. Trial, 10/29/18, at 82. Thus, contrary to the Commonwealth's suggestion, it is not clear that Trooper Stepanski believed Appellant was exhibiting nervous or abnormal behavior at this point of the traffic stop.

trunk, even though he had not been watching the earlier portion of the search. N.T., 10/30/18, at 169-70. Based on Appellant's demeanor and expression as the search moved to the right side of the trunk, Trooper Stepanski believed Appellant "was going to run." *Id.* at 83-84, 114.

On the right side of the trunk, Trooper Stepanski found a white plastic bag. *Id.* at 79. The bag contained rubber bands and 1000 small glassine bags of an off-white substance, which was later confirmed to be approximately twenty-seven grams of heroin. *Id.* at 53, 90[;] Commonwealth's Exhibit 6. The heroin was bundled in sets of fifty bags and wrapped in textbook paper, which Trooper Stepanski testified was a common method used by drug dealers to secure heroin. N.T., 10/29/18, at 84, 86-87. Each individual glassine bag contained a single dose of heroin and was stamped with a blue star logo. *Id.* at 90-91; N.T., 10/30/18, at 272; Commonwealth's Exhibit 6.

At trial, Corporal James Petti of the Pennsylvania State Police Bureau of Forensic Services testified as an expert in fingerprint and palm print analysis. N.T., 10/30/18, at 197, 203. Corporal Petti stated that he examined the white plastic shopping bag and the textbook papers that were wrapped around the heroin bundles. *Id.* at 207. He stated that "there was a lot of touching and friction-ridged skin on … both items," and he was able to find ten identifiable prints and multiple unidentifiable prints. *Id.* at 185, 208-09. While Appellant was excluded as a source for seven of the identifiable prints, no determination could be made for the three other prints. *Id.* at 210-11, 224. Further, Corporal Petti testified that it was possible to not leave fingerprints on an item for a variety of reasons, including wearing gloves or having dry skin. *Id.* at 212.

Brittni Andaloro, a forensic scientist with the Pennsylvania State Police DNA laboratory, testified as a DNA analysis expert. *Id.* at 229-30, 232. She tested twelve samples and eleven of those samples resulted in no interpretable results because of an insufficient quantity of DNA. *Id.* at 240, 242. Ms. Andaloro stated that, from these eleven samples, she could not include or exclude Appellant as a DNA contributor. *Id.* at 240-42. However, she was able to identify that several of the samples contained male DNA. *Id.* at 250-55.

Finally, Detective Sergeant Michael Mish, a twenty[-]year veteran of the Bethlehem Police Department, testified as an

expert in the field of narcotics. *Id.* at 262, 268. Detective Sergeant Mish explained that 1000 bags is a "commonly distributed increment[]" of heroin and it is "very common" for the heroin bundles to be wrapped in textbook paper. *Id.* at 274. This amount of heroin would have a street value of approximately $5000.00. *Id.* at 278. Detective Sergeant Mish testified that when drugs are transported in a passenger vehicle with only a few occupants,

> those couriers always know [there are drugs in the vehicle] because you're not going to employ someone [who does not know] to take thousands of dollars of material from A to B. You're going to want to know that person is being careful[….] … They're going to protect it. It is counterintuitive for that person not to know.

*Id.* at 280. Detective Sergeant Mish stated that, in the context of this stop, "where you're using an interstate and going a significant distance," every individual in the vehicle would be aware of the drugs contained in the vehicle. *Id.* at 294.

Detective Sergeant Mish stated that, in his expert opinion, the heroin found in the vehicle was possessed with the intent to deliver. *Id.* at 287. He relied on several factors in reaching his conclusion. First, the discovery of rubber bands with the heroin indicated a manufacturing use to keep the bundles of heroin together. *Id.* at 283-84. Second, the large quantity of glassine bags was far more than Detective Sergeant Mish had ever seen a user possess. *Id.* at 278; *see id.* at 287 (referring to 1000 bags as "overwhelming numbers, not a borderline number"). Further, no user paraphernalia was found in the vehicle, such as needles, spoons, or opened packets. *Id.* at 278, 287. It was also significant to Detective Sergeant Mish that the drugs were not in an easily accessible area, because users typically purchase and use heroin immediately. *Id.* at 286.

Commonwealth's Brief at 9-15.

From the totality of this evidence, the Commonwealth insists that

Appellant's convictions must be sustained. It summarizes:

> Appellant was present in a vehicle driven by Moses on Interstate 78 where 1000 bags of heroin were found, but no user paraphernalia or other evidence that the drugs were for personal

consumption was discovered. Both Moses and Appellant exhibited signs of nervousness during the stop. In particular, Appellant avoided eye contact with Trooper Stepanski and his demeanor and body language changed significantly as Trooper Stepanski neared the hidden compartment containing the heroin. Police recovered a large amount of heroin, along with rubber bands, which was packaged for individual sale. The heroin was concealed in a hidden compartment that required tools to access and was in an area that would not be accessed for a legitimate purpose. This evidence is sufficient to establish that Appellant committed the crimes of possession with intent to deliver, possession of a controlled substance, possession of drug paraphernalia, and criminal conspiracy.

*Id.* at 15.

Appellant, on the other hand, is adamant that the evidence was insufficient to prove his guilt of the crimes for which he was convicted. He argues that the Commonwealth failed to establish that he constructively possessed the drugs in Moses' trunk. Appellant stresses that "the drugs were found hidden beneath the lining of the trunk in a compartment separate from the passenger compartment where [he] was seated[,]" and there was no evidence that Appellant "ever had access to the trunk." Appellant's Brief at 21, 23. Appellant notes that he cooperated with police, provided correct identification, and voluntarily returned to the police station "well after the arrest date" to provide a DNA sample. *Id.* at 23 n.1. He also correctly observes that, "[w]hile [he] was found in possession of more than one cell phone, the Commonwealth's own expert testified that in today's society this is no longer a suspicious indicator of drug activity." *Id.* at 23 (citing N.T. Trial, 10/30/18, at 298 (Detective Sergeant Mish's testifying that it is "[b]ecoming

more common in today's day and age" for a person to have more than one cell phone).

Additionally, regarding his conviction of criminal conspiracy, Appellant maintains that the evidence admitted at trial proved only that he was present in Moses' car "and that Trooper Stepanski believed him to be acting nervous…." Appellant's Brief at 10. He avers that there "was no evidence - direct or circumstantial - to show that [he] had any agreement or shared criminal intent with Moses." *Id.* He stresses that he,

> was not the owner of the vehicle. There was no evidence that [he] ever spoke to Moses about what was in the trunk of the car. The only evidence the Commonwealth presented of [Appellant's] knowledge or agreement was the fact he was sitting in the passenger's seat of the vehicle in which the drugs were found. However, "[m]ere presence at or near the scene of an offense, it has been held repeatedly, is insufficient to establish that one is part of a conspiracy." [*Commonwealth v.*] *Carter*, [450 A.2d 142,] 145 [(Pa. Super. 1982)].

*Id.* at 11.

After careful review of Appellant's arguments, the case law on which he relies, and the certified record, we agree with Appellant that the evidence was insufficient to support his convictions. Initially, the Commonwealth failed to demonstrate that Appellant constructively possessed the drugs in Moses' vehicle. Regarding the concept of constructive possession, this Court has explained:

> Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super.

2013) (conviction under 18 Pa.C.S. § 6106(a) supported by a finding of constructive possession). *See also Commonwealth v. Parker*, 847 A.2d 745 (Pa. Super. 2004) (same). "Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement." *Hopkins*, *supra* at 820 (citation and quotation omitted). "We have defined constructive possession as conscious dominion," meaning that the defendant has "the power to control the contraband and the intent to exercise that control." *Id.* (citation and quotation omitted). "To aid application, we have held that constructive possession may be established by the totality of the circumstances." *Id.* (citation and quotation omitted).

It is well established that, "[a]s with any other element of a crime, constructive possession may be proven by circumstantial evidence." *Commonwealth v. Haskins*, 450 Pa. Super. 540, 677 A.2d 328, 330 (1996) (citation omitted). In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue. *See*, *e.g.*, *Commonwealth v. Davis*, 743 A.2d 946, 953–54 (Pa. Super. 1999) (holding that evidence was sufficient to prove constructive possession over drugs found in common areas of an apartment where the defendant entered the apartment using his own key, and possessed $800 in cash on his person, and police recovered defendant's identification badge, size-appropriate clothing, and firearms from a bedroom).

Significant to the instant appeal, a defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items. *Commonwealth v. Valette*, 531 Pa. 384, 613 A.2d 548, 551 (1992). Thus, the location and proximity of an actor to the contraband alone is not conclusive of guilt. *Commonwealth v. Juliano*, 340 Pa. Super. 501, 490 A.2d 891, 893 (1985). Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession. *Id.*, citing *Commonwealth v. Thompson*, 286 Pa. Super. 31, 428 A.2d 223, 224 (1981).

If the only inference that the fact finder can make from the facts is a suspicion of possession, the Commonwealth has failed to prove constructive possession. *Valette*, *supra* at 551. "It is well settled that facts giving rise to mere 'association,' 'suspicion'

or 'conjecture,' will not make out a case of constructive possession." *Id.*

*Commonwealth v. Parrish*, 191 A.3d 31, 36-37 (Pa. Super. 2018).

Our decision in *Parrish* provides guidance in the present case. There, Parrish was a back-seat passenger in a vehicle driven by Pernell Riddick, which was stopped by police for a tinted-window violation. *Id.* at 33. As the officers approached the vehicle, they observed "it rocking back and forth." *Id.* Then,

> [] Riddick rolled down the window, and the police officers smelled marijuana and observed a plastic baggie containing marijuana in plain view. They also observed [] Riddick straddling the center console between the two front seats and the grip of a silver handgun protruding from under the front passenger seat. The officers further observed [Parrish] seated behind the driver's seat with his hands on the headrest of the driver's seat.

> The officers arrested [] Riddick and [Parrish] and subsequently searched the entire vehicle. On the floor on the passenger side of the front of the vehicle, the officers found a black bag. In the bag was a loaded .45 caliber handgun, 250 wax paper packets of heroin packaged into bundles, 12 individual packets of methamphetamines, a baggie of loose heroin, two scales, packaging material, and unknown powder substance, a spoon, and a magazine containing .40 caliber ammunition. The officers also found in the front of the passenger cabin of the vehicle, marijuana on the passenger-side door and a .40 caliber handgun protruding from under the passenger-side seat.

> In the glove compartment, the officers found an extra magazine of bullets, and in the trunk, they found a bulletproof vest. The officers also found $1,335 in cash on [Parrish] and $2,168 on Riddick. During his arrest, [Parrish] cooperated with the police, correctly identified himself, and did not attempt to flee.

*Id.* Additionally, at trial, the Commonwealth presented expert testimony of a police officer, who opined that the presence of two guns in the vehicle demonstrated that Riddick and Parrish had each possessed a gun, as the

officer did not "generally come across one person carrying more than one gun in a car." *Id.* at 34 (citation to the record omitted).

Parrish was ultimately convicted of several possessory drug offenses, including PWID, as well as criminal conspiracy. On appeal to this Court, he challenged the sufficiency of the evidence to sustain his convictions, arguing that the Commonwealth had failed to prove he constructively possessed the contraband in the vehicle. We agreed with Parrish and reversed his judgment of sentence, reasoning as follows:

> In the instant case, [Parrish] was sitting in the back the vehicle on the driver's side. The police located all of the contraband in the front of the car. In particular, the police found the black satchel containing contraband on the passenger-side floor of the front of the vehicle, the gun under the front passenger-side seat, and marijuana on the front passenger door.
>
> Moreover, the evidence also established that [Parrish] was not carrying any type of bag when he entered the car; he did not have keys to the car, and was not the owner or operator of it. There is no evidence that [Parrish] had ever been seated in either of the car's front seats. Neither of the recovered firearms was registered to him and there was no fingerprint evidence for either weapon.
>
> Following our review of the evidence, we fail to see how the jury could reasonably infer that [Parrish] had knowledge of the contraband in the black bag located in the front row of the vehicle, let alone exercise dominion and control over its contents. The only evidence presented regarding the black bag in the vehicle was its location and that [Parrish] did not carry a black bag into the vehicle. From this, it is not reasonable for the jury to conclude that [Parrish] knew about the contents of the black bag and exercised dominion and control over it.
>
> Similarly, we fail to see how the jury could reasonably conclude that [Parrish], while sitting in the back seat of the vehicle, had dominion and control over the gun under the passenger-side front seat and the marijuana on front passenger-

- 12 -

side door. Rather, the evidence reveals that [Parrish] was merely present on the driver's side of the back seat of [] Riddick's car, while police officers discovered the contraband on the passenger side of the front row of the vehicle.

Simply stated, the Commonwealth did not present any evidence from which it would be reasonable for the jury to infer that [Parrish] had knowledge of or exercised dominion and control over the contraband.

Moreover, to the extent that Officer Bevilaqua intended to attribute the rocking of the vehicle that he observed following the commencement of the traffic stop to [Parrish] jettisoning himself away from the contraband located in the front seat, we conclude that, absent other evidence, it is equally reasonable to infer that the rocking was caused by Riddick—who police discovered straddling the center console—attempting to obscure his contraband from sight. In addition, given the evidence regarding [Parrish's] height and weight, and the size of the vehicle, it strains credulity to conclude that [Parrish] was able to propel himself from the front seat to the back seat in the short time it took for the officers to reach the vehicle.

Notwithstanding Detective Palka's opinion that, in his experience, the presence of two firearms generally indicates that each occupant possessed a gun, we cannot agree that this evidence is sufficient for a factfinder to conclude that [Parrish] possessed the firearm in this case.

*Id.* at 37-38.

Appellant contends that here, "the evidence of record is even more tenuous than the evidence presented in the *Parrish* case." Appellant's Brief at 23. He explains:

Both [Appellant] and Parrish cooperated with the police, provided correct identification[,][1][] and did not attempt to flee. However, in *Parrish*, much of the evidence was unconcealed in the passenger compartment of the vehicle. … [H]ere, the evidence was secreted in a hidden compartment in the trunk - with no evidence that [Appellant] ever had access to the trunk.

[1] [Appellant] demonstrated even more cooperation with police when, well after the arrest date, [he] returned to the police

- 13 -

upon request and provided a DNA sample while the driver and co-defendant avoided investigators.

Further, Parrish was found with a substantial amount of cash on his person while [Appellant] was not. While [Appellant] was found in possession of more than one cell phone, the Commonwealth's own expert testified that in today's society this is no longer a suspicious indicator of drug activity. Finally, **Parrish** reinforces the conclusion in [**Commonwealth v.**] **Valette**[, 613 A.2d 548 (Pa. 1992),] that any testimony from the Commonwealth's expert as to common practices of individuals traveling in cars with quantities of drug is mere conjecture and suspicion and cannot support a finding of guilt beyond a reasonable doubt. **Parrish**, [191 A.3d] at 38 ("Notwithstanding Detective Palka's opinion that, in his experience, the presence of two firearms generally indicates that each occupant possessed a gun, we cannot agree that this evidence is sufficient for a factfinder to conclude that [Parrish] possessed the firearm in this case.").

Appellant's Brief at 23-24 (citation to the reproduced record omitted).

Appellant's arguments are compelling. In addition to his points, we stress that seven of the identifiable fingerprints on the drugs were not Appellant's, and none of the DNA on the contraband could be verified as his. We recognize that Appellant omits any mention of Trooper Stepanski's testimony that he acted evasively at the start of the traffic stop by avoiding eye contact with the trooper, and that he became extremely nervous and looked like he might run when the trooper's search neared the right-side of the trunk where the drugs were ultimately found. Even considering this testimony, however, the trooper's subjective assessment of Appellant's behavior was not enough for the jury to reasonably infer that Appellant knew about the drugs, where no other evidence established Appellant's knowledge but for his mere presence in the vehicle. Moreover, Appellant's nervousness

- 14 -

could have arisen simply from the circumstances of the stop itself. Notably, Appellant and Moses had fully complied with Trooper Stepanski, yet they were asked to exit the vehicle so it could be searched. At that time, two backup patrol vehicles (including a canine unit) containing three additional officers had arrived at the scene. N.T. Trial, 10/29/18, at 63-64. While Trooper Stepanski searched the entirety of the car, Appellant and Moses stood on the side of a busy interstate highway as traffic passed at "65 [to] 70 miles an hour." *Id.* at 59. During the search, Trooper Stepanski periodically looked back at Moses and Appellant and attempted to make eye contact and "observe their body reactions." *Id.* at 83. Given these facts of the stop and search, and considering that no other evidence established Appellant's knowledge of the drugs in Moses' car, it was not reasonable for the jury to conclude that Appellant knew about the narcotics simply because he acted nervous during the search.

Similarly, Detective Sergeant Mish's expert testimony did not support that Appellant knew about the drugs. In the majority of the detective sergeant's testimony cited by the Commonwealth, he seemed to focus on the knowledge of the **driver** of a vehicle containing drugs, whom he labeled a drug "courier." *See* N.T. Trial, 10/30/18, at 280. On cross-examination, defense counsel attempted to clarify the detective's opinion regarding passengers in such vehicles, questioning the detective sergeant as follows:

> [Defense Counsel:] You made a few statements about couriers, the drivers of the vehicles, correct?

[Detective Sergeant Mish:] Yes.

[Defense Counsel:] How … generally they know what's in the vehicle or claim they don't know, and in subsequent investigation you will find drugs, correct?

[Detective Sergeant Mish:] Yes.

[Defense Counsel:] Is it your opinion that it's also the same for passengers in the vehicle[,] that they automatically know what's in there?

[Detective Sergeant Mish:] Yes.

[Defense Counsel:] Every single person knows what's in someone else's vehicle?

[Detective Sergeant Mish:] Again, in a situation where you're using an interstate and going a significant distance, yes, I would say so.

*Id.* at 293-94.

Detective Sergeant Mish's opinion that **any** passenger of a vehicle containing drugs, that is traveling a lengthy distance on an interstate, **necessarily** knows that drugs are in the car is simply illogical. Moreover, it clear that the ultimate fact for the jury to determine in this case was whether Appellant knew about, and constructively possessed, the drugs in the trunk of the vehicle. Consequently, Detective Sergeant Mish's testimony improperly "invite[d] the jury to abdicate its responsibility to ascertain and assess the facts and, instead, defer to the expert's opinion." *Commonwealth v. Montavo*, 653 A.2d 700, 705 (Pa. Super. 1995) (concluding that a trooper's expert testimony that the "appellant's and his co-defendant's travels to drug trafficking areas indicated that they were involved in narcotics dealing … was beyond the scope of [the] [t]rooper['s] … qualification as an expert") (citing

- 16 -

*Commonwealth v. Carter*, 589 A.2d 1133, 1134 (Pa. Super. 1991) (citations omitted)). Thus, Detective Sergeant Mish's opinion does not support a reasonable inference that Appellant knew about the drugs.

In sum, the evidence presented by the Commonwealth did not demonstrate that Appellant constructively possessed the drugs found in Moses' vehicle. Accordingly, his PWID, possession of a controlled substance, and possession of drug paraphernalia convictions must be reversed. Additionally, absent Appellant's constructive possession of the drugs, there was insufficient evidence to prove that he had "a shared criminal intent" with Moses to deliver those narcotics. *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002) ("[A] conviction for conspiracy requires proof of the existence of a shared criminal intent."). Therefore, we reverse Appellant's conviction for criminal conspiracy, as well.[3]

Judgment of sentence reversed. Appellant discharged. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/19

---

[3] Given our disposition, we need not address Appellant's third issue challenging the weight of the evidence.