J-S15036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHERON TUCKER | : | |
| | : | |
| Appellant | : | No. 959 WDA 2024 |

Appeal from the Judgment of Sentence Entered February 27, 2024
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0007710-2022

BEFORE:   OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED: June 9, 2025**

Cheron Tucker appeals from the judgment of sentence imposed following a non-jury trial wherein he was found guilty of one count of carrying a firearm without a license, a violation of the Uniform Firearms Act of 1995 ("VUFA"), and two counts of recklessly endangering another person ("REAP").[1] Tucker received a three-to-six-year term of incarceration,[2] and on direct review, contests the sufficiency of evidence sustaining his firearm-related conviction. Specifically, Tucker claims the evidence failed to demonstrate that

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. § 6106(a)(1) and § 2705, respectively.

[2] The court sentenced Tucker to thirty-six to seventy-two months of incarceration at the firearm offense and ran the two REAP sentences, each being six to twelve months in length, concurrent with the firearm sentence. "Tucker does not challenge his convictions for [REAP] in this appeal." Appellant's Brief, at 3.

he constructively possessed a firearm. After thoroughly reviewing the record, we affirm.

As recounted by the trial court,

[O]n August 3, 2022, City of Pittsburgh Police Detective Michael Slatcoff observed warrant suspect Malonzo Dixon in the North Side section of Pittsburgh. Dixon was spotted exiting a [Chevrolet] Blazer along with [Tucker], Amir Johnson, and Kylen Maloney. In the weeks leading up to August 3, 2022, Detective Slatcoff had observed [Tucker] and Dixon in this vehicle several times. As he alerted other detectives of his observations, the four individuals reentered the vehicle. Detective Slatcoff followed directly behind the Blazer in an unmarked car as [Tucker] drove to the Rivers Casino. While en route, Detective Slatcoff smelled an odor of burnt marijuana coming from the Blazer and updated fellow detectives with Dixon's locations. As [Tucker] parked at a taxi stand outside the casino, detectives, including Scott Love, Jeffrey Tomer, and Michael Coleman, activated the lights and sirens of the unmarked vehicles and boxed-in the Blazer to effectuate the arrest of Dixon. Collectively, these events were captured by Rivers Casino surveillance cameras and Detective Tomer's body[-]worn camera (["]BWC["]), both which were played at trial. Dixon was heard yelling, "go, go, go[,]" as [Tucker] reversed the Blazer causing it to collide with Detective Coleman's vehicle. [Tucker] then pulled forward towards Detective Love[,] who at this time was out of his vehicle. In response, Detective Love displayed his weapon and commanded the occupants to exit the vehicle. [Tucker] continued forward, and Detective Coleman repositioned his vehicle behind [Tucker] which prevented any further movements.

At this time[,] both [Tucker] and Dixon, who was seated in the front passenger seat, leaned down towards the floorboard. Detective Tomer testified that based on his training and experience[,] this movement is consistent with an effort to either retrieve or conceal something. Eventually, all occupants were removed from the vehicle, including [] Johnson and [] Maloney, who were in the rear seat behind the passenger and driver[,] respectively.

With the vehicle doors open, detectives smelled a strong odor of marijuana from within the vehicle and observed two [] firearms

on the rear passenger floorboard directly behind the driver and front passenger seat. Specifically, a .40 caliber Glock firearm [was] behind the front passenger seat and a .45 caliber Glock firearm [was] behind the driver's seat.

The vehicle was towed from the scene, and after obtaining a search warrant[,] police recovered the two firearms. The parties stipulated that the barrel length of each firearm was fifteen [] inches or less and subsequent forensic laboratory testing established the firearms were operable. Additional DNA testing conducted on the firearms was inconclusive[,] and no comparisons were able to be made to [Tucker]. A certification from the Pennsylvania State Police indicating [Tucker] was unlicensed to carry a firearm was introduced by the Commonwealth [at Tucker's trial].

During the vehicle search[,] police also seized a back strap, used to adjust the grip of a firearm, from the front passenger door pocket. Located in the center console was a black vacuum-sealed bag containing suspected marijuana and a .40 caliber magazine. From the rear row seat, police seized a box of .45 caliber ammunition and a satchel containing ten [] mylar bags of suspected marijuana and [Tucker's] identification[].

Trial Court Opinion, 10/9/24, at 4-6 (record citations and footnote omitted).

The court convicted Tucker of one VUFA charge and two counts of REAP.[3] For these offenses, Tucker received an aggregate three-to-six-year term of incarceration. Tucker timely filed a post-sentence motion, which the court denied. Thereafter, Tucker filed a timely notice of appeal, concurrently appending his statement of matters complained of on appeal.

On appeal, Tucker presents one question for review: "[w]as the

---

[3] Tucker, Dixon, Johnson, and Maloney were tried together; each faced various charges stemming from the August 3, 2022 incident.

evidence insufficient to support [his] conviction for carrying a firearm without a license because the evidence failed to establish that he possessed a firearm?" Appellant's Brief, at 3. As best we can discern, Tucker's challenge is limited to whether the Commonwealth sufficiently demonstrated that he had constructive possession of the at-issue firearm.[4]

Preliminarily, we note that a sufficiency of evidence challenge is a question of law, and as such, our standard of review is *de novo* and our scope of review is plenary. **See Commonwealth v. Parrish**, 191 A.3d 31, 36 (Pa. Super. 2018). For claims of this manner, we employ a well-settled standard of review:

> [i]n reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. [**See**] **Commonwealth v. Moreno**, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. [**See**] **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. [**See**] **Moreno**, **supra** at 136.

**Commonwealth v. Koch**, 39 A.3d 996, 1001 (Pa. Super. 2011) (internal

---

[4] The parties and trial court agree that Tucker was specifically convicted of possessing the .45 caliber Glock found on the rear passenger floorboard behind the driver's seat. **See** Appellant's Brief, at 11-12 ("all four car occupants [were charged] with possessing the two firearms[,]" but "the trial court acquitted the back seat passengers" of their VUFA charges and "Tucker, meanwhile, was convicted of possessing the .45 caliber Glock[]"); Commonwealth's Brief, at 17; Trial Court Opinion, 10/9/24, at 10.

citations formatted for consistency).

The VUFA charge Tucker was convicted of, carrying a firearm without a license, is defined, in relevant part, as follows:

**(a) Offense defined.**

(1) ... [A]ny person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(a)(1). This crime requires the Commonwealth to prove that Tucker "possessed" the contraband. **See Parrish**, 191 A.3d at 36.

This Court has held that "[p]ossession can be found by proving actual possession, constructive possession, or joint constructive possession." **Commonwealth v. Heidler**, 741 A.2d 213, 215 (Pa. Super. 1999). Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. [**See**] **Commonwealth v. Hopkins**, 67 A.3d 817, 820 (Pa. Super. 2013) (conviction under 18 Pa.C.S. § 6106(a) supported by a finding of constructive possession). **See also Commonwealth v. Parker**, 847 A.2d 745 (Pa. Super. 2004) (same). "Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement." **Hopkins**, **supra** at 820 (citation and quotation omitted). "We have defined constructive possession as conscious dominion," meaning that the defendant has "the power to control the contraband and the intent to exercise that control." **Id.** (citation and quotation omitted). "To aid application, we have held that constructive possession may be established by the totality of the circumstances." **Id.** (citation and quotation omitted).

**Parrish**, 191 A.3d at 36.

It is well established that, "[a]s with any other element of a crime, constructive possession may be proven by circumstantial evidence." **Commonwealth v. Haskins**, [] 677 A.2d 328, 330 ([Pa. Super.] 1996) (citation omitted). In other words, the

- 5 -

> Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue. ***See, e.g.***, ***Commonwealth v. Davis,*** 743 A.2d 946, 953–54 (Pa. Super. 1999) (holding that evidence was sufficient to prove constructive possession over drugs found in common areas of an apartment where the defendant entered the apartment using his own key, and possessed $800 in cash on his person, and police recovered defendant's identification badge, size-appropriate clothing, and firearms from a bedroom).

***Parrish***, 191 A.3d at 36-37 (parallel citation omitted).

Nevertheless, mere presence at a place where contraband is found, standing alone, is insufficient to demonstrate constructive possession. ***See, e.g.***, ***Commonwealth v. Valette***, 613 A.2d 548, 551 (Pa. 1992). While spatial nexus, in a vacuum, is not conclusive of guilt, ***see Commonwealth v. Juliano***, 490 A.2d 891, 893 (Pa. Super. 1985), "knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and thus, his constructive possession." ***Parrish***, 191 A.3d at 37. Stated differently, a conjecture-laden "suspicion of possession" is insufficient to demonstrate constructive possession, ***see id.***; instead, there must be some sort of tether or nexus between a defendant's actions or inactions and the object, itself. ***See Commonwealth v. Peters***, 218 A.3d 1206, 1209 (Pa. 2019).

As the Commonwealth was required to demonstrate that Tucker constructively possessed the firearm attributed to him (the .45 caliber Glock), he argues that constructive possession was not proven because there was no forensic evidence linking him to that weapon, the car where the firearm was

found was occupied by four people (with Tucker as the driver), the firearm was recovered on the rear passenger floorboard behind the driver's seat, which was "basically at the feet of . . . Maloney, who was seated in the rear driver's side seat," Appellant's Brief, at 11, and Maloney had an outstanding arrest warrant, apparently implying that she was the more likely possessor of the weapon. In addition, Tucker discounts the court's crediting of the officers' testimony wherein they saw his body "briefly move downwards toward the floor." *Id.*; *see also id.* at 14 (suggesting that officer testimony appeared to be speculative).[5] From this testimony, the court concluded—in Tucker's summation—that Tucker "must have pushed a firearm underneath the driver's seat and into the rear passenger compartment," *id.* at 12 (citing Trial Court Opinion, 10/9/24, at 9-10), notwithstanding there being "too many holes in that logical chain to have the level of confidence necessary to support a verdict of guilt here." *Id.* at 13. Tucker also contends that "the police never tested their supposition that it was possible to stuff a firearm under the driver's seat and into the rear passenger compartment at the drop of a hat, as is alleged to have happened here." *Id.* at 15. Lastly, Tucker posits that his attempted flight from police was explainable given that "the warrant execution was a brazen and unexpected turn of events" that involved "Dixon . . . screaming at

_____

[5] To the extent Tucker is attacking the veracity of the officers' testimony, such a contention would be more appropriate for a weight of the evidence challenge.

. . . Tucker to drive away in the moment when that happened[.]" **Id.** Tucker concludes his brief by stating that "we truly don't know who introduced the firearm in[]to the car, or when they did so. We likewise can only speculate as to how the firearm ended up at the feet of . . . Maloney." **Id.** at 16.

After our review, we find that there was sufficient evidence for the factfinder, in this case the trial court, to conclude beyond a reasonable doubt that Tucker constructively possessed the .45 Glock found directly behind him in the vehicle that he was driving. Viewing the officers' testimony, and the reasonable inferences that can be made therefrom, in a light most favorable to the Commonwealth, as verdict winner, as we must, **see Koch**, 39 A.3d at 1001, we are satisfied that Tucker's association with the contraband, although circumstantial, went beyond "mere presence." Stated succinctly, Tucker's furtive movements, in conjunction with officer testimony establishing the plausibility of a floorboard-based pathway for the gun, allowed for a factfinder to reasonably conclude that Tucker desired to exert control or constructive possession over the firearm, but having been surrounded by law enforcement officials, attempted to conceal the firearm's existence, or Tucker's connection thereto, in a hasty manner.

Multiple detectives testified that they saw Tucker bend down in a way that was inconsistent with a normal traffic stop, i.e., one that would involve acquiring, *inter alia*, proof of vehicle registration from the glove compartment. In particular, Detective Love testified that, as he "was giving verbal commands

at different points[,] he saw . . . Tucker and . . . Dixon both at different points lean down towards the floorboard of the vehicle[.]" N.T. Non-Jury Trial, 11/15/23, at 26. "At different points in time when [Detective Love] was outside[, he] was giving [the occupants of the vehicle] directions to stop, and [he] saw . . . Dixon at one point reach towards the floorboard of the vehicle[,] and [he] also saw . . . Tucker *reach for the floorboard*." ***Id.*** at 27 (emphasis added). Detective Love was "approximately[,] give or take[,] ten feet" from Tucker's vehicle at the time. ***Id.*** at 58. However, Detective Love could not "say what [the vehicle occupants] were reaching for, if they were retrieving something, [he] couldn't tell because [he] was more worried about the vehicle coming at [him]." ***Id.***

Detective Slatcoff testified that there was nothing "more than [in] any other vehicle that [he] had seen" that would have obstructed movement of an object from the front of the Blazer to the back via the floorboard. ***Id.*** at 77. He also indicated that it was possible that "something could have moved from the front to the back" of the vehicle. ***Id.*** The gap between the seats and the floor was "a couple inches" in his estimation. ***Id.*** The detective later reemphasized his earlier belief that the firearm could have moved between the front and back seats. ***See id.*** at 78, 89 ("it would have been very easy to push a gun under the seat. If there was a movement where someone was quickly shoving it in my experience that is very conceivable[]").

When Detective Tomer approached Tucker's vehicle, he noticed that

Tucker "went forward in the vehicle and came back right up[.]" *Id.* at 93. Having executed hundreds of traffic stops over the years, Detective Tomer knew this type of movement to suggest concealment or retrieval. *See id.* While Detective Tomer could not see Tucker's arms, his body was "definitely going forward towards the floor in the vehicle." *Id.* at 94.

> In addressing Tucker's sufficiency claim, the trial court wrote that:
>
> [Tucker] was driving a vehicle that he had been seen in multiple times in the weeks leading up to this incident. When cornered by the police, [Tucker] motioned his body towards the floorboard, which in Detective Tomer's experience is indicative of concealment or retrieval. It was within this vicinity, the floorboard directly behind his seat, that the .45 caliber gun was discovered. This arms-length distance from [Tucker] is consistent with the gun having been pushed backwards from the driver's seat floorboard. Additionally, [Tucker's] efforts to escape police evidence a consciousness of guilt that the firearm along with the other contraband was located inside the vehicle.

Trial Court Opinion, 10/9/24, at 10.

We agree with the trial court's overarching conclusion that the Commonwealth demonstrated constructive possession. This case goes beyond mere "suspicion of possession[.]" *Parrish*, 191 A.3d at 37 (establishing, further, that facts, in linking defendant to contraband via constructive possession, must go beyond "association," "suspicion," or "conjecture"); *but see, e.g.*, *Valette*, 613 A.2d at 551 (finding no constructive possession where "the record demonstrate[d] nothing more than that appellant was present in an apartment in which drugs were found[]"). Instead, here, "[t]he evidence . . . show[ed] a nexus between the accused and the item sufficient to infer that

- 10 -

the accused had the power and intent to exercise dominion and control over it." **Peters**, 218 A.3d at 1209.

Even if we were to depart from the trial court's additional holding that Tucker's attempt to flee provided indicia of his guilt, his quick, bending movements in the direction of the vehicle's floorboard, observed by multiple detectives, coupled with the spatial ability for the gun to fit underneath the seat, support a determination of constructive possession that, under the totality of the circumstances, and viewed in a light most favorable to the Commonwealth under the appropriate standard of review, satisfies sufficiency review. **See, e.g.**, **Commonwealth v. Carter**, 450 A.2d 142, 144 (Pa. Super. 1982) ("[E]vidence of appellant's behavior after the car[, filled with four other occupants,] was stopped—bending down to reach the floor and temporarily failing to respond to the police officer's directions to place his hands on the windowshield—provided . . . weight to the trial court's conclusion that appellant had either placed the gun on the floor while bent over, or, at least, was aware of its presence and intended to exercise control over it."). That the contraband may have been observed at Maloney's feet is of no moment, and does not vitiate the possibility of Tucker's constructive possession of the firearm, because "[t]wo actors may have joint control and equal access and thus both may constructively possess the contraband." **Commonwealth v. Jones**, 874 A.2d 108, 121 (Pa. Super. 2005) (citation omitted).

Since we conclude that the Commonwealth sufficiently proved that

Tucker constructively possessed the recovered .45 caliber firearm, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/9/2025